(No. 20596.—

LUCY S. FRITZ *et al.* Appellants, *vs.* C. M. BOWCOCK *et al.* Appellees.

*Opinion filed October 23, 1931—Rehearing denied Dec. 2, 1931.*

CAREY E. BARNES, and BROWN, HAY & STEPHENS, for appellants.

HOFF & HOFF, EDWARD F. IRWIN, HENRY A. CONVERSE, and CLAYTON J. BARBER, (LAWRENCE HOFF, of counsel,) for appellees.

Mr. COMMISSIONER EDMUNDS reported this opinion:

Lucy S. Fritz and others filed a bill in the circuit court of Sangamon county praying that C. M. Bowcock, Charles P. Summers, W. A. Orr, and others, who were made defendants, be decreed to account for certain moneys. Answers and replications were duly filed, and the cause was referred to a master to take evidence and report the same without his conclusions. Following a hearing upon this report the chancellor dismissed the bill for want of equity. The complainants prayed an appeal to the Appellate Court for the Third District. One of the justices of that court was disqualified and the other two justices were not in agreement as to whether the decree should be affirmed or reversed. That court therefore declared the decree affirmed by operation of law. The cause is here, on appeal of certain complainants, by virtue of a certificate of importance.

Prior to July 1, 1921, Bowcock, Summers and Orr were operating the Lincoln Mutual Casualty Company, which did a considerable casualty business. Desiring, however, to organize a stock company to take over the business of the mutual company, they procured various other individuals (herein made defendants along with them) to join as corporators of a stock company under the name of Lincoln Casualty Company. A signed and acknowledged declaration

of intention to form such a company pursuant to the provisions of "An act concerning the business of casualty insurance," approved April 21, 1899, amended June 30, 1919, (Cahill's Stat. 1922, chap. 73, par. 447, *et seq.*) was duly filed with the insurance department. About the time the declaration of intention was executed, all of the corporators, with the exception of Bowcock, Summers, Orr and one other, signed a power of attorney appointing Bowcock attorney, substitute and proxy to represent them at the first meeting of the corporators and at any adjourned or subsequent meeting, with full power to act in their stead. On July 10, 1921, Bowcock, Summers and Orr held the first meeting of the corporators. No others were present. The minutes of this meeting indicate that Bowcock, Summers and Orr were unanimously "elected as the organizing committee to report to the incorporators in the organization of said company, with instructions to do whatever in their judgment might be necessary to carry out the ideas and carry into effect the authority of certain incorporators as defined under the law and report to the said incorporators on completion of said organization." Acting as this committee, Bowcock, Summers and Orr proceeded to work out a plan whereby 16,000 shares of stock were to be issued, 8000 shares of which were to be sold at the par value of $25 per share, 2000 shares at $50 per share, 2000 shares at $75 per share and 4000 shares at $100 per share. On July 25, 1921, Blanchel A. Murrelle undertook to purchase all this stock, executing four subscription agreements, each of which covered one of the blocks of shares at the price indicated. Each agreement recited the capital of the company to be $400,000 and the surplus $350,000, "consisting of 16,000 shares in the following series," listing the total number of shares at each price. With the exception of the agreement to purchase the block of 8000 shares at par value each agreement also contained an extract from section 2 of the act approved June 24, 1921, and in force July 1, 1921,

hereinafter quoted, and stated that the corporators were authorized to use not more than twenty per cent of the subscription for organization expenses. At this time Murrelle also executed and turned over to Bowcock, Summers and Orr four promissory notes. One note for $200,000 was stated to be in payment for 8000 shares at $25 per share, one note for $80,000 was stated to be in payment for 2000 shares at $50 per share, less a commission of twenty per cent, one note for $120,000 was stated to be in payment for 2000 shares at $75 per share, less a commission of twenty per cent, and one note for $320,000 was stated to be in payment for 4000 shares at $100 per share, less a commission of twenty per cent. Thereupon Murrelle established an office in Springfield, retained salesmen and proceeded to sell stock in the company at a price of $100 per share. Upon making a sale Murrelle gave to the purchaser an order addressed to the company, of which the following, delivered to Lucy Fritz, is an example:

"Please transfer twenty shares of my stock to Lucy Fritz, Greenville, Illinois, and issue receipt for the same.

"Yours truly, B. A. MURRELLE."

Upon presentation of these orders Bowcock and Orr signed interim certificates, which were mailed to the purchasers, accompanied by a letter upon the letter-head of the company and signed by Orr as secretary. One form of interim certificate issued to certain purchasers who are complainants in this suit recited the capital stock of the company to be $400,000 and the surplus $350,000. Another form used made no reference to the amount of capital or surplus. Lucy S. Fritz and the other complainants in the present suit purchased stock from Murrelle, paid to him or his agents the sum of $100 for each share and received interim certificates.

In the spring or summer of 1922 Murrelle became insolvent and left the country. The corporators of the com-

pany, other than Bowcock, Summers and Orr, had not been taking any personal part in what had been going on, although they knew that Bowcock, Summers and Orr were proceeding with the organization. In July or August the corporators held a meeting to consider the situation and finally adopted a new plan for completing the organization. Under this new plan the capital stock of the company was to be $400,000, represented by 16,000 shares of $25, par value, each. The surplus was to be $100,000. Murrelle's subscription was to be canceled and new subscriptions covering the entire 16,000 shares were to be made by Bowcock, Summers, Orr, J. W. Jefferson and J. H. Mulford. Certain securities which had been collected by Murrelle, of a face value of about $120,000, were to be delivered in trust to Joseph F. Bunn, to be used by him in settling with persons who had purchased stock from Murrelle. The organization of the company was to be completed, and shares of stock issued to Bowcock, Summers and Orr were to be transferred in sufficient number to the First State Trust and Savings Bank as trustee and held by that bank until releases had been obtained from all persons who had bought stock from Murrelle. Pursuant to this new plan Murrelle's subscription was canceled and the corporators took over the securities which he had collected. New subscriptions for the 16,000 shares were taken, payment in full was made therefor, and on October 24, 1922, the director of the Department of Trade and Commerce certified that the necessary securities had been deposited with him as required by statute and the organization of the company was completed. In accordance with the plan agreed upon, the Murrelle securities were turned over to Bunn and a certificate for 3333 shares of stock issued to Bowcock, Summers and Orr was assigned in blank and deposited with the bank. After the organization was thus completed, each of the complainants who have appealed to this court received shares of stock in the company for the number of shares originally

subscribed, and each of the complainants, with certain exceptions, signed instruments of which the following is an example:

"Received certificate for fifty-two shares of the capital stock of Lincoln Casualty Company, Springfield, Illinois, in full settlement of my purchase of stock therein.      LUCY K. FRITZ."

The stock certificates were delivered to complainants by J. H. Mulford, assistant secretary of the company, to whom Bowcock, Summers and Orr handed them with instructions to deliver them to persons named on an accompanying list, and Mulford took from complainants the receipts in the form above quoted. The stock certificates received by complainants were all issued out of the certificate for 3333 shares deposited with the bank or out of certificates originating in it. Mulford testified that Bowcock, Summers and Orr did not tell him that Murrelle had sold stock to the people to whom he was to deliver certificates; that they made no explanation to him as to what had occurred previous to completion of the company's organization, and that he said nothing to those to whom he delivered certificates about the capitalization being less than that originally planned.

The argument of the complainants is that the corporators of the company, by virtue of certain statutory provisions hereinafter set out, became bailees of the purchase price paid for the stock which complainants purchased; that the money thus paid in was a trust fund belonging equitably to complainants, and that when the original plan for organizing the company was abandoned and a new one undertaken the corporators became liable to account for the money received, in accordance with the prayer of the bill, which asks "that the corporators may be decreed to pay to your orators, and to others in like situation, such sums of money, with interest thereon, as has been paid by your orators and others in like situation as subscriptions to said capital stock."

The provisions of "An act in relation to the promotion and organization of insurance corporations and to repeal a certain act therein named," approved June 24, 1921, in force July 1, 1921, (Cahill's Stat. 1922, chap. 73, pars. 11-16,) relied upon by complainants, in so far as they are material in the present connection, are as follows:

"Sec. 2. (*a*) No person, firm or corporation, for the purpose of organizing or promoting any insurance corporation to be organized or proposed to be organized under the laws of this or any other State or country, shall sell or agree or attempt to sell within this State any capital stock in such insurance corporation unless the contract of subscription or of sale shall be in writing and contain a provision in the following language: 'No sum shall be used for commission, promotion and organization expenses on account of any share of stock in this corporation, whether sold within or without this State, in excess of ........ per cent, of the amount actually paid in cash upon separate subscriptions (or in lieu thereof there may be used the words 'in excess of $........ per share from each subscription fully paid in cash)' for such stock, and the remainder shall be held or invested as authorized by the laws governing the investments of such insurance corporation, and held by the corporators ·and by the directors and officers of such corporation after organization as bailees for the subscriber, to be used only in the conduct of the business of insurance by such corporation after having been licensed therefor by proper authority.' * * *

"(*c*) Funds and securities held by the corporators as bailees for the subscribers, shall be deposited with a National bank or a State bank or trust company of the State or country under the laws of which such corporation is being organized until it has been duly authorized to carry on the business for which it is being organized, and every contract within sub-section (*a*) shall contain a stipulation to such effect.

"(*d*) Every contract within sub-section (*a*) shall set forth the names of the corporators and their residence and every contract within either sub-section (*a*) or (*b*) shall set forth the par value of the shares (which, in the case of every contract within sub-section (*a*), shall be not less than twenty-five dollars nor more than one hundred dollars per share), the total number of shares, the prices at which the authorized capital stock has been, is being and is to be sold and the number of shares at each price and be filled in with the percentage or amount which may be used for promotion, organization, commission or other selling expense, which together shall not exceed twenty per cent of the amount actually received in cash upon separate subscriptions for stock and also shall not be greater, in the case of any separate subscription, than the excess of the selling price over the par value thereof."

Several reasons why complainants cannot maintain their suit are advanced by the corporators. So far as the statute is concerned, they contend that it imposes no liability upon them, under the facts in this case, because re-sales of stock are not included within its scope; that its only prohibition is against selling stock when the contract does not contain certain specified provisions; that the statute does not expressly impose any liability upon the corporators; that inasmuch as it is unambiguous no liability can be read into it, and that in any case the duty of bailees can be held to be placed upon the corporators only when they receive the money paid, and they cannot be held to be guarantors of the fact that they will receive the money. Apart from insisting that the statute confers upon complainants no rights in the first instance, the corporators further contend that if any liability is thereby imposed upon them it is in the nature of a penalty, and the present suit is therefore barred by the two-year Statute of Limitations; that if any right of action exists it is not in the complainants but in the Lincoln Casualty Company; that if any right of action

existed in favor of complainants it was wiped out by the releases given when they received their certificates, and, in the cases of Lucy S. Fritz and certain other complainants, by still further releases which were executed; and that, regardless of all other considerations, complainants are barred from maintaining this suit because they have not returned or offered to return the stock, and certain dividends thereon, which they actually received, nor do they in their bill allege a willingness to make such return. Complainants reply that the liability imposed by the statute, and herein relied upon, is not in the nature of a penalty and does not come within the two-year Statute of Limitations; that the right conferred runs in their favor and not that of the corporation; that the receipts given at the time the stock certificates were delivered, even if considered to be releases in form, cannot be given effect because they were secured without the full disclosure of facts which the alleged fiduciary relationship between the corporators and complainants made necessary; that such further instruments as were executed present no bar because they were not under seal and their effect was contingent upon performance of certain conditions which have not been carried out, and that, under the circumstances here disclosed, no return or tender of what they received is a prerequisite to seeking the relief prayed.

Regardless of what might be said under other circumstances as to the merits of the argument by which it is attempted to establish the corporators' liability, it is a necessary conclusion that the present complainants do not show themselves to be in a position from which they can appeal to the conscience of the chancellor. He who seeks equity must do equity. Whatever be the nature of the controversy between two definite parties and whatever be the nature of the remedy demanded, the court will not confer its equitable relief upon the party seeking its equitable interposition and aid unless he has acknowledged and concluded, or will admit and provide for, all equitable rights,

claims and demands justly belonging to the adversary party and growing out of or necessarily involved in the subject matter of the controversy. (*DeWalsh* v. *Braman*, 160 Ill. 415.) In *Hanson* v. *Keating*, 4 Hare, 1, Vice-chancellor Wigram said: "If, for example, a plaintiff seeks an account against a defendant, the court will require the plaintiff to do equity by submitting himself to account in the same matter in which he asks an account, the reason of which is that the court does not take accounts partially, and perhaps ineffectually, but requires that the whole subject be, once for all, settled between the parties." The rule referred to will be applied when the adverse equity grows out of the very controversy before the court, or of such circumstances as the record shows to be a part of its history, or is so connected with the cause in litigation as to be presented in the pleadings and proofs, with full opportunity afforded to the party thus recriminated to explain or refute the charges. (*Comstock* v. *Johnson*, 46 N. Y. 615.) In the light of these principles, complainants can not expect a court of chancery to order payment to them of the moneys which they paid for stock while they insist upon retaining the stock and dividends which were accepted by them in the course of the transaction.

Complainants concede it to be a settled principle that where it is sought to set aside or avoid contracts or transfers of property there must be a return of or an offer to return the consideration received, but, they argue, this principle has no application here because complainants are relying upon affirmative rights conferred by the statute and are not seeking to cancel or avoid any transaction had with the corporators—not even the alleged releases contained in the receipts which were executed by them. These instruments, they say, are void because they were executed in ignorance of their true nature. It is unnecessary to give consideration to the question whether the evidence sustains complainants' contention in this latter connection. It is also

unnecessary to determine whether or not complainants, by asking return of their money, are in substance and effect seeking to cancel and avoid such transactions as they had with the corporators. The cases which hold that one seeking to rescind a contract or transaction must place the other party *in statu quo,* or offer to do so, are only making an application of the fundamental maxim that he who seeks equity must do equity, and it cannot avail complainants to insist that the present case does not fall within the factual scope of those authorities.

Complainants point out that in their bill they alleged "that they have demanded of the defendants an accounting and re-payment of the amounts subscribed by them, and each of them, as aforesaid, together with interest thereon, and said defendants have refused and failed to return said funds or any of them;" that in their answers defendants admitted that a demand for an accounting had been made and was refused, and that in their answers they further alleged that the complainants were not entitled to any accounting. It is urged that under this state of the record such refusal to account relieved complainants from any obligation of making a tender, because it would have been only an idle ceremony. Assuming that if it appeared that a tender had been made and was refused, or that a tender made by the complainants would have been without avail, complainants would not be barred from maintaining their suit, the present record contains no such showing.

The judgment of the Appellate Court is affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Edmunds is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Judgment affirmed.*